# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF
# TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES "JARRETT" HANUS, KATIE HANUS, JOSEPH "J.R." HUMPHRIES, TESS HUMPHRIES, JASON GREEN, LESLEE GREEN, AND SARAH SMITH | § § § § § | |
| *Plaintiffs,* | § § § § | |
| v. | § § | CIVIL ACTION NO. 4:19-CV-03102 |
| ARKEMA, INC., RICHARD RENNARD, RICHARD P. ROWE, ANDREW BURDETT AND BUREAU VERITAS NORTH AMERICA, INC., AND CENTERPOINT ENERGY, INC. | § § § § § § § | |
| *Defendants* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT,
## SUBJECT TO PLAINTFFS' MOTION TO REMAND

**NOW COME** Plaintiffs, JAMES "JARRETT" HANUS, KATIE HANUS, JOSEPH "J.R." HUMPHRIES, TESS HUMPHRIES, JASON GREEN, LESLEE GREEN, and SARAH SMITH (collectively, "Plaintiffs") file this First Amended Complaint, subject to Plaintiffs' Motion to Remand, pursuant to Fed. R. Civ. P 15(a), and would respectfully show unto the Court as follows:

## I. PARTIES

1.      **ARKEMA, INC., DEFENDANT** [hereinafter referenced as "ARKEMA"] has answered suit and is being served through its counsel of record.

5.     **MICHAEL KEOUGH, DEFENDANT** herein, is an Individual who is a resident of the State of New Jersey and may be served with process at his home at the following address: 222 Fern Avenue, Westmont, New Jersey 08108, or wherever he may be found. Service of said Defendant as described above can be effected by personal delivery.

6.     **LESLIE COMARDELLE, DEFENDANT** herein, is an Individual who is a resident of the State of Texas and may be served with process at his home at the following address:18015 Salt Meadow Lane, Crosby, Texas 77532, or wherever he may be found. Service of said Defendant as described above can be effected by personal delivery.

7.     **RICHARD RENNARD, DEFENDANT** herein, is an Individual who is a resident of the State of Texas and may be served with process at his home at the following address: 914 Main St. #1605. Houston, Texas 77002, or wherever he may be found. Service of said Defendant as described above can be effected by personal delivery.

8.     **RICHARD P. ROWE, DEFENDANT** herein, is an Individual who is a resident of the State of Pennsylvania and may be served with process at the following address: 900 First Avenue, King of Prussia, Pennsylvania 19406, or wherever he may be found. Service of said Defendant as described above can be effected by personal delivery.

9. **CENTERPOINT ENERGY, INC., DEFENDANT** ("CenterPoint") is a Texas corporation and public utility responsible for providing electricity, electronical transformers and other electrical conduits to the Crosby facility. Defendant CenterPoint improperly installed, maintained, connected, failed to elevate, and/or failed to comply with guidelines, best practices, rule and/or regulations regarding the provision and maintenance of electrical services/connections within a flood zone. Defendant CenterPoint's conduct contributed to the failure of the flow of electricity to critical facilities on the Crosby facility required to prevent

the failure of the refrigeration system at issue in this case. Defendant CenterPoint Energy, Inc., may be served with process by serving its registered agent CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

**10. DEFENDANT CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC** ("CenterPoint Houston") is a domestic limited liability company and public utility responsible for providing electricity, electrical transformers, and other electrical conduits to Arkema, Inc. and Arkema, S.A.'s Crosby facility. CenterPoint Energy Houston Electric, LLC improperly installed, maintained, connected, failed to elevate, and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the provision and maintenance of electrical services/connections within a flood zone. CenterPoint Energy Houston Electric, LLC's conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. CenterPoint Energy Houston Electric, LLC's principal office is located in Harris County, Texas. CenterPoint Energy Houston Electric, LLC may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

**11. DEFENDANT FISK ELECTRIC COMPANY** ("Fisk") is a domestic limited liability company and electric company responsible for designing and installing the electrical system in Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, Fisk Electric Company improperly installed, maintained, connected, failed to elevate, and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the provision and maintenance of electrical services/connections within a flood zone. Fisk Electric Company's conduct contributed to the failure of the flow of electricity to critical facilities on

Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. Fisk Electric Company may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

12. **DEFENDANT KUHLMAN CORPORATION** ("Kuhlman") a/k/a Kuhlman Electric Company is a corporation and it manufactured, designed, and/or marketed the TRPD01 Pad Mounted Electrical Transformer, Model No. Spec. 2-5731, Serial No. 2-57181 ("TRPD01 Transformer"), at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, TRPD01 Transformer was one of the electrical transformers that provided electricity to refrigeration system at issue in this case. Further, based upon information and belief, Kuhlman Corporation did not have proper instructions and/or warnings accompanying its TRPD01 Transformer regarding the installation/placement of the electrical transformer within a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the installation/placement and maintenance of its TRPD01 Transformer within a flood zone. Kuhlman Corporation's conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. Kuhlman Corporation may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

13. **DEFENDANT EATON CORPORATION** ("Eaton") f/k/a Cooper Industries is a Ohio corporation and it manufactured, designed, and/or marketed the TRPD02 Pad Mounted Electrical Transformer, Model No. 00567A68K30A, Serial No. 966001625 ("TRPD02 Transformer"), at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, TRPD02 Transformer was one of the electrical transformers that provided electricity to refrigeration system at issue in this case. Further, based upon information and belief, Eaton

Corporation or its predecessor Cooper Industries did not have proper instructions and/or warnings accompanying its TRPD02 Transformer regarding the installation/placement of the electrical transformer within a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the installation/placement and maintenance of its TRPD02 Transformer within a flood zone. Eaton Corporation's or its predecessor Cooper Industries' conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. Eaton Corporation may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

14.   **DEFENDANT S&C ELECTRIC COMPANY ("S&C")** is an Illinois corporation and it manufactured, designed, and/or marketed the disconnect switches, both Model No. 90412, on TRPD01 Transformer and TRPD02 Transformer at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, S&C Electric Company did not have proper instructions and/or warnings accompanying its disconnect switches regarding their proper installation/placement within a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the placement and maintenance of its disconnect switches within a flood zone. S&C Electric Company's conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. S&C Electric Company may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

15.   **DEFENDANT KOHLER CO. ("KOHLER") D/B/A KOHLER POWER SYSTEMS** is a Wisconsin corporation and it manufactured, designed, and/or marketed the 4-

GN-2 Generator ("4-GN-2 Generator") at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, 4-GN-2 Generator was one of the generators that provided the backup power to the refrigeration system at issue in this case, in the event the corresponding electrical transformer failed. Further, based upon information and belief, Kohler Co. did not have proper instructions and/or warnings accompanying its 4-GN-2 Generator regarding the proper placement in a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the installation/placement and maintenance of its 4-GN-2 Generator within a flood zone. Kohler Co.'s conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. Kohler Co. may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

16.     **DEFENDANT SULLAIR LLC ("SULLAIR")** is a Michigan limited liability company and it manufactured, designed, and/or marketed the 21-GN-1 Generator ("21-GN-1 Generator") at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, 21-GN-1 Generator was one of the generators that provided the backup power to the refrigeration system at issue in this case, in the event the corresponding electrical transformer failed. Further, based upon information and belief, Sullair LLC did not have proper instructions and/or warnings accompanying its 21-GN-1 Generator regarding the proper installation/placement within a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the installation/placement and maintenance of its 21-GN-1 Generator within a flood zone. Sullair LLC's conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility

required to prevent the failure of the refrigeration system at issue in this case. Sullair Corporation may be served with process by serving its registered agent **CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

17.    **DEFENDANT PRAXAIR SERVICES, INC. ("PRAXAIR")** is a Connecticut corporation and it installed, manufactured, sold, maintained, and/or supplied the liquid nitrogen vessel at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, the liquid nitrogen vessel provided the last backup measure to provide power to the refrigeration system at issue in this case. Further, based upon information and belief, Praxair Services, Inc. did not properly install the liquid nitrogen vessel and/or install/place it at an adequate height for an area located within a flood zone. Additionally, Praxair Services, Inc. did not have proper instructions and/or warnings accompanying the liquid nitrogen vessel regarding its proper installation/placement within a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the installation/placement and maintenance of its liquid nitrogen vessel within a flood zone. Praxair Services, Inc.' conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. Praxair Services may be served with process by serving its registered agent **The Prentice-Hall Corporation System, 211 E. 7th Street, Suite 620, Austin, Texas 78701.**

18.    **DEFENDANT TEXAS ELECTRIC EQUIPMENT COMPANY, LTD. ("TEXAS EEC")** is a Texas limited partnership and it refurbished, repaired, and/or maintained the TRPD02 Pad Mounted Electrical Transformer, Model No. 00567A68K30A, Serial No. 966001625 ("TRPD02 Transformer"), at Arkema, Inc. and Arkema, S.A.'s Crosby facility. Based upon information and belief, TRPD02 Transformer was one of the electrical

transformers that provided electricity to refrigeration system at issue in this case. Further, based upon information and belief, Texas EEC did not have proper instructions and/or warnings accompanying its TRPD02 Transformer regarding the installation/placement of the electrical transformer within a flood zone and/or failed to comply with guidelines, best practices, rules, and/or regulations regarding the installation/placement and maintenance of its TRPD02 Transformer within a flood zone. Texas EEC's conduct contributed to the failure of the flow of electricity to critical facilities on Arkema, Inc. and Arkema, S.A.'s Crosby facility required to prevent the failure of the refrigeration system at issue in this case. Texas Electric Equipment Company Ltd. may be served with process by serving its registered agent, **Edward J. Hoemer, 9401 Highway 225, La Porte, Texas 77571.**

19. At all times material hereto, all plaintiffs are or were residents and/or property owners in Crosby, Texas who have suffered harms and damages as a result of defendants' culpable acts and omissions, as described in greater detail herein below.

20. The individual plaintiffs are as follows:

(1)   **James "Jarrett" Hanus,** is an Individual whose address is 17206 Adlong School Road Crosby, Texas 77532-4817.

(2)   **Katie R. Hanus** is an Individual whose address is 17206 Adlong School Road Crosby, Texas 77532-4817.

(3)   **Joseph "J.R." Humphries,** is an Individual whose address is 19510 Crosby Eastgate Road, Crosby, Texas 77532.

(4)   **Tess Humphries** is an Individual whose address is 19510 Crosby Eastgate Road, Crosby, Texas 77352.

(5)    **Jason Green** is an Individual whose address is 18903 Crosby Eastgate Road, Crosby, Texas 77532.

(6)    **Leslee Green** is an Individual whose address is 18903 Crosby Eastgate Road, Crosby, Texas 77532. and

(7)    **Sarah Smith** is an individual whose address is 19606 Crosby Eastgate Road, Crosby, Texas 77532.

## II.    VENUE AND JURISDICTION

21.    This suit was originally filed in state court on August 15, 2019 under Cause No. 2019-56602, in the 165th Judicial District Court of Harris County, Texas.

22.    On August 19, 2019, Arkema filed its Answer in state court and Notice of Removal asserting federal jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441 and 1446.

## IV. MATERIAL FACTUAL ALLEGATIONS

23.    Arkema is a specialty chemicals manufacturer that "supports the chemical industry by developing intermediate products which are essential to manufacturing processes. Its products are also used in the operating processes of industrial facilities." https://www.arkema.com/en/markets-and-solutions/plastics-and-additives/. Worldwide, Arkema has annual sales of EUR 5.7 billion (US $7 billion) and 15,200 employees, 80 industrial sites in more than 40 countries and six research and development centers.

24.    Arkema owns and operates plants and facilities throughout the world, including facilities in Bayport, Texas, Beaumont, Texas, Clear Lake, Texas, Houston, Texas, and Crosby, Texas. Its Crosby facility is located at 18000 Crosby Eastgate Road, Crosby, Texas 77532. The site, at 18000 Crosby Eastgate Road, is located in a floodplain and has experienced flooding in the past.

**25.**    For years before August 29, 2017, Arkema used its Crosby plant to produce, process

and store large amounts of chemicals and chemical products, to be used primarily to manufacture

plastic bottles and other plastic goods, plastics and acrylic, resins, polypropylene and PVC and

polyester reinforced fiberglass.

**26.**    The chemicals and chemical products included a large volume of manufactured

organic peroxides with the brand name Luperox®, and a large volume of raw materials and other

chemicals, including but not limited to isobutylene, mineral oil, mineral spirits, acetone, sulfuric

acid, propylene glycol, hydrogen peroxide, chloride compounds, cumene compounds and caustic

soda.

**27.**    The materials produced, processed and stored at Arkema's Crosby plant, their

constituents, contaminants and by products, alone and in combination are highly noxious,

corrosive and toxic, containing or capable of producing classes of dangerous materials such as

polycyclic aromatic hydrocarbons, volatile and semi-volatile organic contaminants, and dioxins.

When ignited or burned, they generate pollution by releasing into the air particulate matter

dangerous to humans.

**28.**  Because many of them are flammable and chemically unstable, posing a high risk

of explosion, safe storage of the material present at the Crosby plant requires special

precautions, including but not limited to keeping them refrigerated.

**29.**    Arkema has long followed a haphazard approach to the safe handling of chemicals

at its Crosby facility, rendering the plant one of the most dangerous industrial sites in Texas.

**30.**    For example:

        **(a)** In 1999, a violent explosion of organic peroxides required nearby residents to

be sheltered in place;

**(b)** In 2006, the State of Texas sought to impose penalties on Arkema for its improper storage of organic peroxides, which had resulted in the discharge of more than a ton of volatile organic compounds to the environment;

**(c)** In 2011, the Texas Commission on Environmental Quality ["TCEQ"] found that over a period of months, Arkema had failed properly to maintain pollution control devices known as thermal oxidizers;

**(d)** In 2012, the U.S. Occupational Safety and Health Administration ["OSHA"] formally advised Arkema that its chemical storage plants lacked "design calculations for the worst-case scenario."

**(e)** In 2016, OSHA fined Arkema for multiple violations, which OSHA characterized as "serious," relating to the handling of hazardous chemicals, including the improper "process safety management of highly hazardous chemicals."

30.     And while Arkema purportedly maintains "an accidental release prevention program" to "minimize the risk of hazardous chemical releases," those programs have clearly failed. Arkema and its Crosby facility have racked up over a dozen violations and "informal enforcement actions" over safety and environmental problems over the past five years, according to records from the Environmental Protection Agency and OSHA.

31.     Records indicate that Arkema has had a history of utilizing equipment even when safety systems were not working properly. Those records further indicate that Arkema failed to inspect and/or test as recommended. In one unit, the company also failed to ensure equipment there was safe and/or failed to keep its nearly sixty employees up to date on their training.

32. These incidents and regulatory citations were not the only events that provided Arkema with notice of the dangers inherent in its Crosby operations, and the need to take precautions against well- known risks of explosion and chemical releases.

33. Indeed, as long ago as 2009, Arkema, a sophisticated and highly profitable chemical producer, explicitly identified floods and hurricanes, common in East Texas, with related power failures, as potential hazards to its Crosby plant.

34. In 2013, Arkema conducted a "process hazard analysis," identifying safety concerns for the Crosby facility including risks of equipment failure, loss of cooling capability, power failures, floods and hurricanes.

35. In 2016, engineers from Arkema's own insurer identified flood risks to the Crosby facility, including the site's placement within a significant floodplain, and the need to establish protective measures "independent" of flooding. Not only did Arkema fail to implement such measures, it also failed to inform relevant personnel of the existence of the insurer's report.

36. Its awareness of risk to the Crosby plant notwithstanding, Arkema failed to take necessary precautions against explosions, such as implementing additional backup equipment, elevating generators above flood levels, taking steps to shelter hazardous materials from wind or water, or abating the explosive or ignitable nature of the chemicals produced or stored there.

37. In 2008, Hurricane Ike made landfall over Galveston, killing 103 people and causing more than $50 billion in damage. The following year, Arkema identified floods and hurricanes *as well as power failure and loss of cooling*—as threats to its Crosby site. Still, Arkema did little to update its contingency plans. The plans, which the company must file with the EPA every four years, likewise failed to include any measures to raise critical equipment like backup

generators above possible flood levels. Nor did the plans call for isolating hazardous materials from high wind or water−two very common hazards of any hurricane or tropical storm that could foreseeably and regularly hit the gulf coast.

38.    Thus, it should come as no surprise that as news reports began warning of the devastating rains that could be expected from Hurricane Harvey−nearly a week before its landfall, few steps were taken at the Crosby facility to guard against the very threats that Arkema had identified following Hurricane Ike. Arkema did not transfer its highly volatile products from its warehouse to a location off site---despite the fact that the Crosby facility is in a flood plain but instead transferred the products to diesel-powered refrigerated containers on site. Those containers were not raised or elevated.

39.    In late August, Hurricane Harvey pounded the Houston area, including Crosby, with high winds and more than forty inches of rain, flooding Arkema's Crosby plant.

40.    On August 29, 2017, Arkema officials advised local authorities that the Crosby plant had lost all electrical power including backup generators, and that the materials onsite "could now explode and cause a subsequent, intense fire" which Arkema now had "no way to prevent."

41.    This catastrophic condition would have been avoided had Arkema acted promptly to remove its large volumes of organic peroxides to an appropriately elevated "laydown" area of the site, but Arkema failed to do so.

42.    Arkema's advice resulted in the State of Texas employing National Guard troops to carry out an immediate, forced evacuation of all residents located within a 1.5mile radius, including the vast majority of plaintiffs.

**43.**      Arkema failed to properly disclose and warn plaintiffs of the dangers associated with the chemicals at the facility. Information obtained post-incident indicates that a toxic soup of chemicals was released from the Crosby facility, including: Acetic acid; Cumene; Isoprene; Propylene; Acetone; Diborane; Isopropanol; Propylene Oxide; Acrolein; 1,1-Dichloroethene; Isopropyl Acetate; Silicon Tetrafluoride; Acrylonitrile; Dichloromethane; MAPP; Sulfur Dioxide; Acrylic Acid; Dichlorodifluoromethane; Methyl Acetate; Sulfur Hexafluoride; Allyl Alcohol; 1,1-Difluoroethane; Methyl Ethyl Ketone; Sulfur Mustard; Ammonia; Difluoromethane; Methanol; Nitrogen Mustard; Arsine; Ethanol; Methylbromide; Phosgene; Bis- Chloroethyl Ether; Ethyl Acetate; Methylene Chloride; Phosphine; Boron Tribromide; Ethyl Formate; Methyl Methacrylate; Tetrachloroethylene; Boron Trifluoride; Ethylene; MTED; 1,1,1-Trichloroethane;1,3-Butadiene; Formic Acid; Naphthalene; Trichloroethylene; 1-Butene; Freon 134a; n-Butyl Acetate; Trichloromethane; 2-Butene; GA (Tabus); n-Butyl Alcohol; Triethylamine; Carbon Chloride; Germane; Nitrogen Trifluoride; Trimethylamine; Carbon Tetrafluoride; Hexafluoroacetone; Phosphorus Oxychloride; Trimethyl Phosphite; Chlorodifluoromethane; Isobutylene; Propyl Acetate; and Vinyl Acetate.

**44.**      The sudden and rushed nature of the evacuation referenced was itself traumatic to plaintiffs.

**45.**      Residents in the mandatory evacuation zone, including plaintiffs herein, were forced to leave their homes, unable to prevent or abate the damage done by Harvey and its floodwater. Others whose homes remained intact after the Hurricane, were forced to abandon their homes, livestock, even family pets, as law enforcement came door-to-door forcing them to leave their homes.

**46.**      Plaintiffs' properties have been diminished in value as a result of the above-reference

releases and the culpable conduct of Arkema.

47.    Arkema completely evacuated its Crosby facility by 7:00 p.m. on August 29, 2017.

48.    As a result of the highly predictable loss of power at the Arkema plant, its refrigeration systems shut down, beginning an equally predictable decomposition of chemicals stored there.

49.    Arkema personnel removed some of the chemicals to refrigerated trailers on site, but flood waters soon compromised that refrigeration, and between August 31 and September 3, 2017, nine trailers– containing approximately 10,000 plastic containers of organic peroxides exploded, emitting a plume of thick black smoke into the air and onto surrounding properties including those within the 1.5- mile evacuation zone.

50.    The smoke was noxious, caustic and irritating to human respiratory systems, and, as it spread throughout the area, deposited layers of ash and particulate matter onto properties inside and outside the evacuation zone, including those owned by plaintiffs. Plaintiffs suffered the immediate physical symptoms normally caused by exposure to such materials, including difficulty breathing, headaches and nausea.

51.    In addition to these general, immediate symptoms, plaintiffs suffered specific, adverse health effects as a result of their exposure to the materials released from Arkema and the aftermath of the release.

52.    An additional, similar plume of contaminants was released on September 3, 2017, when Arkema deliberately exploded six additional trailers in an effort to control the destruction of the by now decomposing, unstable chemicals within them.

53.    The known byproducts associated with the organic peroxide that burned and released

into the air include the following: Carbon Dioxide, Ethane, Acetone, t-amyl alcohol, branched

Nonanes,methane, 2-Butanone, heptane, heptenes, 2-ethylhexanoic acid, benzene, benzoic acid,

t-butyl phenyl ether, t-butyl alcohol, 2.5-dihydroxy-2-5, dimethylhexane,methyl ethyl ketone,

mesityl oxide.

 **54.** These releases into the air were not merely irritating. Testing including that

conducted by the Texas Department of Environmental Quality (TDEQ) on surface water and soil

on affected properties has revealed that the explosions caused the release of more than 62,000

pounds of toxins, including naphthalene and other polycyclic aromatic hydrocarbons such as the

carcinogen benzo-a-pyrene and chrysene, as well as other toxins including acetone, carbon

monoxide and diesel byproducts.

 **55.** On or about August 29, 2017, a storage tank containing organic peroxides and two

waste water tanks failed, causing releases of additional toxic materials into flood waters migrating

onto and off-site into the evacuation zone. The containment area surrounding the waste water

tanks was insufficient to prevent the overflow onto and off of the site.

 **56.** The TDEQ has estimated that more than 20,000 pounds of contaminants,

including but not limited to petroleum distillates and their byproducts, mineral spirits, organic

peroxide and trimethyl benzene were released from the tanks.

 **57.** In keeping with its longstanding policy, Arkema refused to disclose to the public,

including plaintiffs and neighboring residents, the identity, ingredients, toxic or the dangerous

nature of the chemicals stored at its Crosby plant until well after plaintiffs' evacuation had taken

place. Instead, Arkema's officers and managers consistently denied and/or understated the true

risks of harm to plaintiffs.

 **58.** As a result of Arkema's intentional failure to prepare, its employees were forced to

abandon the Crosby facility on August 29, 2017, leaving behind hazardous and toxic chemicals with no supervision. Those chemicals required refrigeration, and the lack thereof was going to undoubtedly cause the chemicals to break down and ignite. Knowing this, and upon information and belief it having happened before at this very facility, Arkema and its safety managers and engineers nonetheless failed to adequately prepare for back-up refrigeration of those chemicals in the event of a power outage or other catastrophe-an issue that Arkema has previously been cited for by the governmental authorities.

59.     Subsequent to having its employees abandon the facility, an arbitrary 1.5-mile radius was drawn around the Crosby facility, and all persons in that radius were mandatorily evacuated from their homes and businesses. Everyone was made to sit and wait, waiting for the inevitable explosion of toxic chemicals into the air in and around Crosby, Texas. In the interim, Arkema, Inc.'s representatives Richard Rennard, Richard P. Rowe, and Michael Keough held press conferences in Harris County, Texas and repeatedly denied that the chemicals were toxic or harmful in any manner to the people, and first responders, in the community. More specifically, Defendants Rennard and Keough made intentional and blatantly false statements that the chemicals were not dangerous to the community or to the residents. Moreover, numerous residents, and government officials requested and demanded that Arkema release the all chemicals that were being stored at the Crosby facility including the Tier II chemicals, to which Arkema refused to provide. Plaintiffs relied upon these representations and suffered serious bodily injuries as a result.

60.     Residents, including plaintiffs herein, who had no health issues before the evacuation, soon began complaining of upper respiratory infections, bronchitis, pneumonia, itchy, burning eyes, tight, burning throats, and the like—illnesses and injuries that did not exist prior to

the explosions and fires at the Arkema facility and illnesses resulting from and exacerbated by the explosions and fire at the Arkema facility.

61.    When plaintiffs were finally permitted to return to their homes, they discovered damages to their properties that would not have occurred but for the evacuation.

62.    Plaintiffs' properties were littered with soot, ash and oily residues deposited by the Arkema releases into the air. Due to the lack of electricity during the evacuation, plaintiffs incurred spoilage of their food supplies and other damage to their personal property. The material deposited on plaintiffs' properties contain the toxins referenced above, as well as toxic heavy metals, including lead, nickel and cyanide. Plaintiffs' soil, surface water and drinking water wells have been damaged as a result.

63.    Because of their forced absence from the property, plaintiffs were unable to mitigate the effects of high volumes of rain and resultant moisture in their homes. The houses owned and occupied by many plaintiffs are now infested with excessive levels of mold.

64.    Plaintiffs have been and will be required to expend money in an effort to remediate the damage to their properties resulting from Arkema's culpable conduct.

65.    Both during and since their evacuation, plaintiffs have been deprived of the quiet enjoyment of their properties, all with accompanying annoyance, inconvenience, and disturbance of their daily lives.

66.    Plaintiffs have been physically exposed to toxic, noxious substances with potential adverse health effects, further adding to their discomfort, loss of a sense of safety in their own homes, and emotional distress. These exposures, all occurring above normal background levels, will require plaintiffs to undergo medical surveillance and/or monitoring.

66.    Plaintiffs' properties have been diminished in value as a result of the above referenced releases and the culpable conduct of Arkema.

67.     Plaintiffs also suffered damage to or loss of personal property, including clothing, furniture, food, bathroom and kitchen fixtures, appliances, personal and commercial equipment and vehicles, carpets, and children's toys.

68.     Plaintiffs suffered the loss of pets and livestock due to their forced absence and related inability to tend to the animals and/or the animals' exposure to hazardous conditions.

69.     Various plaintiffs have also suffered a loss of business income, wages and earnings as a result of the damage to their property or to their person. ***Electrical Systems at the Cosby Facility Were Negligently Designed, Installed, and Maintained***

70.     Additionally, Defendants CenterPoint, CenterPoint Houston, and Fisk knew or should have known that the provision of electricity at the Crosby facility would be within a flood zone. Defendants CenterPoint, CenterPoint Houston, and Fisk knew or should have known that there were specific rules, regulations, standards, and codes governing how electrical equipment, connections and structures were to be installed, designed, and maintained in flood zones.

71.     Despite having actual and/or constructive knowledge of those codes and standards, Defendants CenterPoint, CenterPoint Houston, and Fisk knowingly violated, disregarded, and ignored the specific standards/codes intended and created to avoid the type of loss of electricity Defendant Arkema contends contributed to the release of the deadly toxins/chemicals from its facility.

72.     The electrical connections were located at or below the elevations reasonably necessary to avoid or prevent flood waters from compromising the provision of electricity to the facility. Furthermore, in other areas where the electrical connections were flooded, Defendants

CenterPoint, CenterPoint Houston, and Fisk constructed the connections in such a manner that the flow of electricity would be compromised in the event of flooding. For example, electrical transformers were placed no more than ten inches off the ground in a known flood zone.

73.     The National Electric Code and FEMA guidelines have clear standards to minimize loss of electrical services during flooding. Despite these standards, Defendants CenterPoint, CenterPoint Houston, and Fisk failed to comply, which caused electrical services at the facility to be lost.

74.     Additionally, the electrical systems at the Crosby facility were all tied to a single point of failure, which meant that a failure at that one point compromised the entire system.

75.     All Defendants were negligent in implementing and relying on the compromised and non-compliant electrical system. They failed to design and install reliable secondary backup systems not dependent on a single point of failure. Defendants' negligence in both design, location, installation, wiring, and maintenance of the electrical systems at the facility caused a loss of electricity, which in turn caused the refrigeration systems to cease functioning, allowing the chemicals to rise in temperature and combust, releasing toxic and harmful pollutants.

76.     CenterPoint Defendants knew or should have known that the provision of electricity at the Crosby facility would be within a flood zone. Defendant CenterPoint knew or should have known that there were specific rules, regulations, standards, and codes governing how electrical equipment, connections and structures were to be installed, designed, and maintained in flood zones.

77.     Despite having actual and/or constructive knowledge of those codes and standards, Defendant CenterPoint knowingly violated, disregarded and ignored the specific standards/codes intended and created to avoid the type of loss of electricity Defendant Arkema contends contributed to the release of the deadly toxins/chemicals from its facility.

**78.**     The electrical connections were located at or below the elevations reasonably necessary to avoid or prevent flood waters from comprising the provision of electricity to the facility. Furthermore, in other areas where the electrical connections were flooded, Defendant CenterPoint constructed the connections in such a manner that the flow of electricity would be compromised in the event of flooding. For example, electrical transformers were placed no more than 10 inches off the ground in a known flood zone.

**79.**     The National Electric Code and FEMA guidelines have clear standards to minimize loss of electrical services during flooding. Despite these standards, Defendant CenterPoint failed to comply, which caused electrical services at the facility to be lost.

**80.**     Additionally, the electrical systems at the Crosby facility were all tied to a single point of failure, which meant that a failure at that one point compromised the entire system.

**81.**     The electrical transformers at the Crosby facility were also negligently designed. Although the electrical transformers were pad mounted, they were not high enough off of the ground to be protected against potential flooding. Based upon information and belief, when the electrical transformers were installed, Defendants Kuhlman Electric Company, Cooper, and S&C Electric Company marketed the electrical transformers to be installed without considering the relevant topographical and environmental concerns of the installation area. Further, there were no warnings on the electrical transformers regarding installing them in a high-risk flood area.

**82.**     Even after these electrical transformers were serviced and inspected, especially after previous major rain events such as Hurricane Ike, Defendants CenterPoint and CenterPoint Houston never raised or elevated the electrical transformers at the Crosby facility.

**83.**     Plaintiffs suffered the foregoing harms and damages, all of which are or may be permanent, as a result of the culpable acts and omissions of defendants, as set forth in the following causes of action.

## V. CAUSES OF ACTION

## COUNT ONE - NEGLIGENCE

## PLAINTIFFS VS. ARKEMA, BUREAU VERITAS, AND INDIVIDUAL DEFENDANTS

84.     Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

85.     Plaintiffs' harms and damages were proximately caused by Arkema's negligence, all of which was committed by Arkema's employees, servants and/or agents acting within the course and scope of their employment, service and/or agency at all times material hereto.

86.     Said negligence consisted, *inter alia*, of:

    a.   negligent handling and storing of hazardous materials;

    b.   negligent failure to have in place appropriate emergency preparedness, spill prevention and control, or pollution prevention plans at the Crosby plant;

    c. negligent failure to carry out appropriate emergency spill prevention or pollution prevention plans at the Crosby plant;

    d. negligent failure to place and maintain equipment necessary for the safe storage of hazardous materials at the Crosby plant, including adequate refrigeration and "backup" generators and other equipment;

    e. negligent failure to take any steps to reduce hazardous characteristics of chemicals employed and produced at the Crosby plant;

    f. improper siting of the plant in an area vulnerable to flooding;

    g. maintenance of inadequate contamination containment and other pollution prevention facilities at the Crosby plant;

22

**h.** failure to warn plaintiffs or the public regarding certain releases from the Crosby plant, including the above-referenced releases from its storage and waste water tanks;

**i.** failure to take prompt appropriate action to prevent harm done to plaintiffs' properties during the evacuation or to remediate the harm that was done;

**j.** negligent training of Crosby plant personnel in the safe handling, processing and storage of hazardous materials on site, and the prevention of off-site releases;

**k.** negligent supervision of the Crosby plant's personnel and operations;

**l.** negligent failure to take special precautions required to protect against severe environmental risks of which defendant had actual notice, including the risks posed by hurricanes and floods;

**m.** negligent failure to inform relevant supervisory staff regarding documented environmental risks faced by the Crosby facility;

**n.** negligent failure to comply with regulatory, commercial and industrial standards, including but not limited to those promulgated by the American Institute of Chemical Engineers and federal agencies including the Environmental Protection Agency and the Federal Emergency Management Agency;

**o.** negligent failure to implement and maintain reasonable electrical backup facilities and in placing electrical facilities within a flood zone with actual and/or constructive knowledge of the risk of flooding at the site;

**p.** negligent failure to backup systems without a single common point of failure;

**q.** negligent reliance on a compromised and non-compliant electrical system;

**r.** failure to exercise due care under the circumstances.

23

## COUNT TWO - NEGLIGENCE
## PLAINTIFFS VS. CENTERPOINT AND FISK DEFENDANTS

**87.**     Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

**88.**     Plaintiffs' harms and damages were proximately caused by CenterPoint's negligence, all of which was committed by CenterPoint's employees, servants and/or agents acting within the course and scope of their employment, service and/or agency at all times material hereto.

**89.**     Said negligence consisted, *inter alia*, of:

a.      negligent placement of electrical transformers, connections, structures and equipment below elevations reasonably necessary to avoid compromise of electrical systems by flood water;

b.      negligent design and construction of electrical connections and systems at the Crosby facility;

c.      negligent and/or knowing violation of applicable safety codes and standards, including those issued under the National Electric Code and by the Federal Emergency Management Agency ("FEMA");

d.      failure to design and install reliable secondary backup systems not dependent on a single point of failure;

e.      negligent maintenance and inspection of the electrical systems at the Crosby facility;

f.      failure to exercise due care under the circumstances.

## COUNT THREE – GROSS NEGLIGENCE
### PLAINTIFFS VS. ALL DEFENDANTS

90.    Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

91.    Defendants unconscionably and wantonly neglected to take the actions reasonably required to correct their past mistakes and omissions and unconscionably and wantonly neglected to reasonably protect the citizens of Crosby, Texas and surrounding communities from the unreasonably dangerous condition they created. These acts of omission and commission, included, but were not limited to those as described herein.

92.    Defendants committed acts of omission and commission, which collectively and severally, constituted malice under Texas law, which malice was a proximate cause of the accident described herein. Plaintiffs seek exemplary damages as allowed by law in an amount to be determined at trial. These acts of malice involved an extreme degree of risk considering the probability and magnitude of harm to others; and of which defendants had actual, subjective awareness of such risks involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others.

## COUNT FOUR – NEGLIGENCE *PER SE*
### PLAINTIFFS VS. ALL DEFENDANTS

93.    Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

94.    Defendants' conduct described herein constitutes an unexcused breach of duty imposed by law. Plaintiffs are members of the class that the law was designed to protect. Defendants' unexcused breach of the duty imposed by the law proximately caused the plaintiffs' injuries described herein.

25

## COUNT FIVE – NUISANCE
## PLAINTIFFS VS. ARKEMA

**95.**    Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

**96.**    Defendant's above-referenced conduct in the operation of its Crosby plant comprised a nuisance which substantially interfered with plaintiffs' right to the quiet enjoyment of their properties, and caused them unreasonable discomfort and annoyance, and resulted in the other harms and damages alleged herein above.

## COUNT SIX – TRESPASS
## PLAINTIFFS VS. ARKEMA

**97.**    Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

**98.**    Arkema's culpable conduct, which caused hazardous materials to invade plaintiffs' properties without their permission comprised a trespass.

**99.**    Plaintiffs' harms and damages resulted from said trespass.

## COUNT SEVEN – ULTRA HAZARDOUS ACTIVITY
## PLAINTIFFS VS. ARKEMA

**100.**    Plaintiffs hereby incorporate by reference the preceding paragraphs above, in their entirety.

**101.**    Arkema's conduct and operation of its Crosby, Texas plant, including but not limited to its handling, processing and storage of hazardous materials in a location in close proximity to a heavily populated area and important natural resources, comprised ultrahazardous activity subjecting it to strict liability for plaintiffs' harms and damages, all of which were proximately caused by the ultrahazardous activity.

26

## COUNT EIGHT - NEGLIGENT MISREPRESENTATION
## PLAINTIFFS VS. ARKEMA, BUREAU VERITAS, AND INDIVIDUAL
## DEFENDANTS

**102.**  Defendants Arkema and Bureau Veritas, through the various representations made, supplied false information to Plaintiffs, the Crosby community, and the public at large concerning the Crosby facility, the risk and consequences of the explosions, and the like. Defendants Arkema and Bureau Veritas downplayed the risks associated with the explosions, fire, and toxicity of the chemicals at issue. Defendants Arkema and Bureau Veritas further represented that the dangers associated with the explosions and fire at the Crosby facility were akin to standing next to a campfire or the result of a decaying animal.

**103.**  Defendants Arkema and Bureau Veritas supplied this false information and failed to exercise reasonable care when doing so. Plaintiffs justifiably relied upon these representations to their detriment.

**104.**  As a proximate result of Defendants Arkema and Bureau Veritas' negligent misrepresentations Plaintiffs have suffered substantial harm and injury. Plaintiffs are entitled to recover all actual damages, both general and special, against Defendants for tortious representations.

## FRAUD BY NON-DISCLOSURE
## PLAINTIFFS VS. ARKEMA, BUREAU VERITAS, AND INDIVIDUAL
## DEFENDANTS

**105.**  Defendants Arkema and Bureau Veritas' actions as described herein constitute fraud by non-disclosure. Defendants concealed from, or failed to disclose, certain facts to Plaintiffs. Defendants Arkema and Bureau Veritas had a duty to Plaintiffs to disclose the facts to them, and the facts which were concealed were material facts. Defendants Arkema and Bureau Veritas knew Plaintiffs were ignorant of the facts and that Plaintiffs did not have an equal opportunity to discover the facts. Defendants Arkema and Bureau Veritas were deliberately silent

27

when they had a duty to speak, and in their failure to disclose the facts, Defendants intended to induce Plaintiffs to take some action or refrain from acting. Plaintiffs in this suit relied on the Defendants Arkema and Bureau Veritas' non-disclosure, and were injured as a result of acting without the knowledge of the undisclosed facts.

## COMMON LAW FRAUD
## PLAINTIFFS VS. ARKEMA, BUREAU VERITAS, AND INDIVIDUAL DEFENDANTS

**106.** Defendants Arkema and Bureau Veritas' actions as described herein constitute common law fraud. Defendants Arkema and Bureau Veritas made representations to Plaintiffs which were material and false. When Defendants Arkema and Bureau Veritas made these representations, they knew the representations were false, or made the representations recklessly, as a positive assertion, and without knowledge of its truth. Defendants made the representations with the intent that Plaintiffs act on them. Plaintiffs relied on the representations, which caused Plaintiffs to suffer injuries, as more fully described herein.

## STRICT LIABILITY
## PLAINTIFFS VS. ARKEMA

**107.** Defendant Arkema manufactures inherently dangerous chemicals and is strictly liable for any injuries which result from the manufacture of those chemicals. Furthermore, due to the specific guidelines which must be followed in storing those chemicals, Defendant Arkema's storage of the inherently dangerous chemicals is an ultra-hazardous activity, for which strict liability attaches. Defendant Arkema's chemicals were susceptible to exploding and Defendant Arkema failed to store the chemicals in such a manner so as to prevent them from exploding. Defendant Arkema is strictly liable for its failure to properly store the inherently dangerous chemicals, which failure was a proximate cause of the explosions and resulting injuries to Plaintiffs.

## CAUSES OF ACTION AGAINST DEFENDANTS KUHLMAN, COOPER, S&C, KOHLER, SULLAIR, PRAXAIR, & TEXAS EEC

**108.** Plaintiffs incorporate by reference all preceding paragraphs as if fully stated herein and further state as follows:

### A.    NEGLIGENCE

**109.** On the occasion in question, as more fully described above in Section III, Defendants Kuhlman, Cooper, S&C, Kohler, Sullair, Praxair, and Texas EEC ("Electrical/Backup Equipment Defendants") committed acts of omission and commission, which collectively and separately constituted negligence. The Electrical/Backup Equipment Defendants had a duty to exercise ordinary care, meaning that degree of care that would be used by any company of ordinary prudence under the same or similar circumstances, and the Electrical/Backup Equipment Defendants breached that duty, including but not limited to one or more of the following ways:

a.    In failing to implement and maintain reasonable electrical backup facilities and in placing electrical facilities within a flood zone with actual and/or constructive knowledge of the risk of flooding at the site;

b.    In failing to backup systems without a single common point of failure;

c.    In failing to properly install/place and maintain electrical transformers, generators, and/or liquid nitrogen vessel at an adequate elevation in a known flood zone;

d.    In failing to warn regarding the proper installation/placement of the electrical transformers, generators, and/or liquid nitrogen vessel in a known flood zone; and

e.    In failing to adequately prepare for a major flood event, having had the knowledge that such an event was foreseeable.

**110.** Defendants' breaches were a proximate cause of the occurrence in question and the injuries and damages sustained by Plaintiffs herein.

## B.   GROSS NEGLIGENCE

**111.** The Electrical/Backup Equipment Defendants unconscionably and wantonly neglected to take the actions reasonably required to correct their mistakes and omissions, and unconscionably and wantonly neglected to reasonably protect the citizens of Crosby, Texas and surrounding communities from the unreasonably dangerous condition they created. These acts of omission and commission, included, but were not limited to those as described herein under Section VI (A).

**112.** The Electrical/Backup Equipment Defendants committed acts of omission and commission, which collectively and severally, constitute malice under Texas law, which malice was a proximate cause of the incident described herein. Plaintiffs seek exemplary damages as allowed by law in an amount to be determined at trial. These acts of malice involved an extreme degree of risk considering the probability and magnitude of harm to others; and of which Defendants had actual, subjective awareness of such risks involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others.

## C.   MARKETING DEFECT/FAILURE TO WARN

**113.** The Electrical/Backup Equipment Defendants failed to give adequate and proper warnings and instructions regarding the dangers of installing/placing the electrical transformers, generators, and liquid nitrogen vessel too low to the ground in a known flood zone. The electrical transformers, generators, and liquid nitrogen vessel should contain warnings, at installation, of the dangers associated with certain environmental and topographical factors when choosing the placement and/or height of placement of the equipment. These marketing defects/failures to warn caused crucial equipment to flood during Hurricane Harvey, and in turn, were a producing cause of Plaintiffs' injuries and damages described herein.

30

### D.      DESIGN DEFECT

**114.** The design of the electrical transformers, generators, and liquid nitrogen vessel were defective and unreasonably dangerous because they were too low to the ground. Such defectively designed equipment was not elevated high enough to protect against flooding.

**115.** The Electrical/Backup Equipment Defendants were consciously aware that properly designed equipment would be elevated high enough off of the ground to prevent them from being flooded in a rain event, such as Hurricane Harvey. Moreover, the Electrical/Backup Equipment Defendants made the conscious decision to forego the incorporation of these design features in an effort to reduce costs and in doing so risked Plaintiffs' safety for the sake of additional profits and savings.

**116.** At the time the subject electrical transformers, generators, and liquid nitrogen vessel left Defendants' respective control, there were safer alternative designs. These alternative designs were technologically and economically feasible at the time the electrical transformer, generators, and liquid nitrogen vessel were designed and manufactured and would have prevented this incident, Plaintiffs' serious injuries, and Plaintiffs' resulting damages. Such safer alternative designs would not have materially impaired the utility of the subject equipment.

### E.      NEGLIGENCE *PER SE*

**117.** The Electrical/Backup Equipment Defendants' conduct described herein constitutes an unexcused breach of duty imposed by law. Plaintiffs are members of the class that the law was designed to protect. Defendants' unexcused breach of the duty imposed by the law proximately caused the Plaintiffs' injuries described herein.

### F.      NUISANCE

**118.** The Electrical/Backup Equipment Defendants' actions as described herein constitute a public and private nuisance. Specifically, Defendants interfered with and/or invaded

Plaintiffs' private interest in their land by conduct that is negligent, intentional and unreasonable, and/or abnormal and out of place in its surroundings. The Electrical/Backup Equipment Defendants further created a condition that resulted in unreasonable interference with rights common to the general public, and its conduct unreasonably interfered with the public's health and safety. As a result of the Electrical/Backup Equipment Defendants' conduct, Plaintiffs live in a state of fear preventing them from using and enjoying their property, and Plaintiffs' property values have diminished as a result. This conduct substantially interferes with Plaintiffs' private use and enjoyment of the land and caused injury to the Plaintiffs. Plaintiffs have suffered harm to their property and persons, as well as personal discomfort and annoyance. Plaintiffs are entitled to exemplary damages in addition to any other damages awarded based upon the Electrical/Backup Equipment Defendants' conduct.

### G.    TRESPASS

**119.**  The Electrical/Backup Equipment Defendants' actions described herein constitute a trespass upon Plaintiffs' property. Plaintiffs are owners of real property and the Electrical/Backup Equipment Defendants' actions constituted a physical, intentional, voluntary and unauthorized entry upon Plaintiffs' land, causing injuries to Plaintiffs' right of possession. As a result of Defendants' conduct, Plaintiffs have suffered injury to their persons and property. Plaintiffs are entitled to actual damages, mental anguish damages and exemplary damages as a result of the Electrical/Backup Equipment Defendants' conduct.

### CONVERSION

**120.**  The Electrical/Backup Equipment Defendants actions described herein constitute a conversion of Plaintiffs' property. Plaintiffs are owners of personal property and Defendants wrongfully exercised dominion or control over Plaintiffs' property, causing Plaintiffs to suffer injuries as described herein.

32

## VI. CLAIM FOR PUNITIVE DAMAGES

## PLAINTIFFS VS. ALL DEFENDANTS

121.    Defendants' above-referenced culpable conduct was conducted in willful, wanton and reckless disregard for the rights, health and safety of plaintiffs and defendants' conduct, including their failure to take measures they knew were necessary to protect the environment and the health and safety of plaintiffs and the public, was motivated by defendants' self-interest and desire for profit.

122.    Accordingly, plaintiffs seek an award of exemplary damages in an amount sufficient to punish defendants and to deter others from similar wrongdoing.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMESIS CONSIDERED, Plaintiffs' pray that Defendants be cited to appear and answer herein as the law directs, and that upon final hearing, Plaintiffs have and recover judgment of and from Defendants, jointly and severally, a sum in excess of the minimum jurisdictional amounts of this Court, costs of court, pre-judgment and post-judgment interest which may be authorized by law, and for such other and further relief, both general and special, at law and in equity, to which Plaintiffs may be justly entitled.  Furthermore, Plaintiffs ask the Court to provide them the additional following relief:

a) an order requiring Defendants to:

i.pay for the costs of an environmental investigation sufficient to determine the full areal extent and impact of the releases from the Crosby plant;

ii.pay for the costs of an appropriate scientific study to determine and inform the public of actual and potential adverse health effects caused by the releases from the Crosby plant; and

b) such other relief the Court deems just and equitable.

Respectfully submitted,

**WELLER, GREEN, TOUPS &TERRELL, L.L.P.**
P O BOX 350
BEAUMONT, TEXAS 77704
(409) 838-0101
(409) 832-7823 (FAX)
hartgr@wgttlaw.com

**E. HART GREEN**
STATE BAR NO. 08349290
FEDERAL BAR NO.: 24121

**ATTORNEY FOR INTERVENOR**
**PLAINTIFFS, HANUS, HUMPHRIES, GREEN**
**And SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, a copy of the above and foregoing was served upon all counsel of record in accordance with the Federal Rules of Civil Procedure.

**E. HART GREEN**

34